**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 09-00156 SI |
| Plaintiff, | No. CR 13-00693 SI |
| v. | **ORDER RE JULY 25, 2014 MOTIONS** |
| ELIJAH COOPER, | |
| Defendant. | |

On July 25, 2014, the Court held a hearing on various motions brought by defendant. Having considered the arguments of counsel and the papers submitted, the Court hereby rules as follows.

## BACKGROUND

On February 5, 2013, a confidential human source ("CHS"), working with the FBI, engaged in a controlled narcotics purchase with suspect Anthony Knight. Declaration of Ethan A. Balogh ("Balogh Decl.") Ex. B. While the CHS was discussing the terms of the buy with Knight, a white Mercedes pulled into the parking lot and Knight went to meet with the driver of the Mercedes. *Id.* The Mercedes then drove away again. *Id.* Knight then got into the CHS's car, gave the CHS an ounce of crack cocaine, and told the CHS that Knight's supplier had to go back and get the remainder of the drugs. *Id.* When the Mercedes returned to the parking lot, Knight went to meet with the Mercedes's driver again, and then gave the CHS the remainder of the drugs the CHS had paid for. *Id.*

1    The FBI sought to ascertain who had been driving the white Mercedes.  A query to the California

2 Department of Motor Vehicles, based upon the car's license plate number, revealed that the car was

3 registered to a Johnny Ray Trammell. *Id.* Ex. H ¶ 64 n.11.  The CHS was shown a photo of Trammell,

4 but the CHS said that the driver of the Mercedes was younger looking. with close cropped hair. *Id.* ¶ 71.

5 The CHS was then shown a photo of Tony Befford; the CHS identified Befford as the driver. *Id.*

6    Agents then tried to verify the CHS's identification of the driver as Befford. *Id.* ¶ 72.  The

7 agents conducted further surveillance of the white Mercedes, but concluded that the driver was not

8 Befford. *Id.*  The agents then asked the San Francisco Police Department ("SFPD") to conduct a traffic

9 stop to determine who the driver was. *Id.*  The SFPD complied, and identified the driver as defendant

10 Elijah Cooper. *Id.*  Cooper was wearing a royal blue hooded sweatshirt when the SFPD conducted the

11 traffic stop. *Id.*

12    On February 6, 2013, federal agents asked CHS about the misidentification of Cooper as

13 Befford. *Id.* ¶ 73.  The CHS was then shown a photo of Cooper; the CHS identified Cooper as the driver

14 of the white Mercedes. *Id.*  The CHS stated that, during the controlled buy, Cooper's hair was "a bit

15 longer" than depicted in the photo. *Id.* Ex. D.  One agent asked the CHS what the driver had been

16 wearing during the controlled drug buy. *Id.* Ex. H. ¶ 73.  The CHS responded that the driver of the

17 white Mercedes had been wearing a "royal blue hoodie." *Id.*

18    On February 21, 2013, the government sought a wiretap for Knight's telephone, and named

19 several individuals, including Cooper, as target subjects for surveillance. *Id.* Ex. G, at 2.  On April 4,

20 2013, the government sought two more wiretaps, one of which was for Cooper's mobile phone. *Id.* Ex.

21 L.

22    The FBI agents were aware that Cooper, at that time, was serving a term of supervised release

23 for a prior narcotics trafficking conviction.  Declaration of Jacob D. Millspaugh ("Millspaugh Decl.")

24 ¶ 2.  The agents decided not to contact Cooper directly because they believed that the contact would be

25 noticed and Cooper would be considered a snitch, and thereby placed in danger. *Id.*  Therefore, the

26 agents decided to contact Cooper's probation officer, Octavio Magaña, to see if he could help arrange

27 a meeting. *Id.*

28

On August 16, 2013, FBI agents, SFPD officers, and an Assistant U.S. Attorney ("AUSA") went to Mr. Magaña's office to meet with Cooper. *Id.* ¶ 3. After Cooper arrived and learned who all the individuals were, Cooper was advised that they had evidence he was engaged in drug dealing, and that it was in his interest to cooperate with them. *Id.* Cooper was not questioned about the crimes under investigation; rather, he was told about some of the evidence against him. *Id.*

On September 26, 2013, following weeks in which Cooper never responded regarding his willingness to cooperate, agents swore out a criminal complaint against Cooper for distribution of cocaine base and conspiracy to distribute. *Id.* ¶ 5. On October 4, 2013, the FBI agents, SFPD officers, and an AUSA, again went to Mr. Magaña's office to meet with Cooper. *Id.* ¶ 6. The AUSA asked Cooper if he had considered what had been discussed at the August, 2013 meeting. *Id.* Cooper stated that he wanted to see a lawyer. *Id.* He was immediately arrested. *Id.*

Two SFPD officers then transported Cooper to the San Francisco Hall of Justice for post-arrest processing. *Id.* ¶7. According to Cooper, he was placed in an interrogation room, shown photos of men from his neighborhood, and asked questions about the activities of those men. Declaration of Elijah Cooper ("Cooper Decl.") ¶ 6. Cooper declined to answer any questions. *Id.* Because Cooper was arrested after the Friday morning magistrate calendar had already concluded, Cooper was lodged at the San Francisco County Jail until he could be arraigned on the following Monday. Millspaugh Decl. ¶ 7.

On October 17, 2013, the grand jury returned a two-count indictment against Cooper, charging him with: (1) distribution of cocaine base, in violation of 21 U.S.C. §§ 841 (a)(1), 841 (b)(1)(B)(iii); and (2) conspiracy to distribute cocaine base, in violation of 21 U.S.C. § 846.

Cooper now brings the following motions: (1) a motion to dismiss the Form 12 supervised release violation pursuant to his prior conviction; (2) a motion to dismiss the indictment in the instant case; (3) a motion for a bill of particulars and other discovery relief; (4) a motion to suppress evidence of identification obtained through the traffic stop; (5) a motion to suppress evidence of the CHS's out-of-court identification of Cooper; (6) a motion to suppress statements and to dismiss the indictment for violation of Cooper's Sixth Amendment right to counsel; (7) a motion to suppress evidence derived from

1   wiretaps; and (8) a motion to suppress evidence obtained by pen registers and trap and trace devices.

2   The Court shall address each motion in turn.

3

4                                         **DISCUSSION**

5   **1.       Motion to Dismiss Form 12.**

6          On October 18, 2013, after Cooper was arrested in this case, Cooper's Probation Officer, Mr.

7   Magaña, filed a Form 12, asserting several violations of the terms of Cooper's supervised release.

8   Cooper now moves to dismiss the Form 12, arguing that Mr. Magaña's conduct violated Cooper's due

9   process rights because Mr. Magaña's actions were those of a law enforcement officer, rather than an

10  officer of the court.  In the alternative, Cooper asks the Court to exercise its supervisory powers to

11  dismiss the Form 12.

12         "Outrageous government conduct is not a defense, but rather a claim that government conduct

13  in securing an indictment was so shocking to due process values that the indictment must be dismissed."

14  *United States v. Montoya*, 45 F.3d 1286, 1300 (9th Cir. 1995) (citation omitted).  To satisfy this

15  standard, a defendant must allege conduct "so grossly shocking and so outrageous as to violate the

16  universal sense of justice."  *United States v. Barrera-Moreno*, 951 F.2d 1089, 1092 (9th Cir. 1991)

17  (internal quotation marks omitted).  "The standard is not met when the government merely infiltrates

18  an existing organization, approaches persons it believes to be already engaged in or planning to

19  participate in the conspiracy, or provides valuable and necessary items to the venture." *United States*

20  *v. Gurolla*, 333 F.3d 944, 950 (9th Cir. 2003).

21         Where a court finds that the government has engaged in outrageous conduct that falls short of

22  a due process violation, it may exercise its supervisory powers to dismiss the pending indictment.

23  *United States v. Ross*, 372 F.3d 1097, 1109 (9th Cir. 2004).  However, to justify an exercise of the

24  court's supervisory powers, the alleged misconduct "must (1) be flagrant and (2) cause substantial

25  prejudice to the defendant." *United States v. Fernandez*, 388 F.3d 1199, 1239 (9th Cir. 2004) (citation

26  and internal quotation marks omitted).

27         The Court finds that the asserted conduct in this case did not violate Cooper's due process rights,

28  and could not justify the exercise of the Court's supervisory powers to dismiss the indictment.  Cooper

**United States District Court**
For the Northern District of California

4

United States District Court
For the Northern District of California

argues that Mr. Magaña abdicated his role as a judicial officer because he took part in discussions wherein the U.S. Attorney's Office asked Cooper to work with it as a cooperating witness.  Cooper contends that Mr. Magaña's presence at two meetings where an AUSA spoke to Cooper, as well as his failure to tell Cooper that he could not agree to cooperate without obtaining the Court's permission, warrants dismissal of the Form 12.  Additionally, Cooper submitted a declaration stating that, between the two meetings, Mr. Magaña visited Cooper's home on three or four occasions, and each time he asked Cooper whether Cooper was going to agree to be an informant.  Cooper Decl. ¶ 5.  Accepting Cooper's version of the facts as true, the Court finds that Mr. Magaña's conduct was not "so grossly shocking and so outrageous" as to violate defendant's due process rights.  *See Barrera-Moreno*, 951 F.2d at 1092. Nor was Mr. Magaña's conduct so flagrant and prejudicial to Cooper as to warrant the exercise of the Court's supervisory powers.  *See Fernandez*, 388 F.3d at 1239.

However, as the Court noted on the record at the hearing on this motion, the Court is troubled by the practice of using a probation officer as Mr. Magaña was used here.  Probation officers have an obligation to those they supervise, as well as an obligation to the Court, and have important ongoing relationships with both groups.  In this Court's view, these obligations and relationships could be impaired by enlisting probation officers in the kinds of investigatory and prosecutorial activities that occurred here.  At the hearing, counsel for the government explained that the government arranged the meetings through Mr. Magaña both to avoid compromising an ongoing investigation, and to protect Cooper from potential reprisals if his associates began believing Cooper was "snitching."  The Court accepts the government's explanation, but finds that it does not justify the use of a probation officer in this manner.  Nevertheless, the Court concludes that dismissing the Form 12 is not the proper remedy here, given its finding that the conduct is neither grossly shocking and outrageous, nor flagrant and prejudicial.

Accordingly, the Court DENIES defendant's motion to dismiss the Form 12.

**2.       Motion to Dismiss the Indictment.**

Cooper next moves to dismiss the indictment in the instant case, arguing that it is too lacking in factual detail to support the charges against him.

5

Federal Rule of Criminal Procedure 7(c) provides that an indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." In the Ninth Circuit, an indictment is usually sufficient if it sets forth the elements of the offenses charged. *United States v. Fernandez*, 388 F.3d 1199, 1200 (9th Cir. 2004); *see also United States v. Woodruff*, 50 F.3d 673, 676 (9th Cir. 1995) ("In the Ninth Circuit the use of a 'bare bones' information – that is one employing the statutory language alone – is quite common and entirely permissible so long as the statute sets forth fully, directly and clearly all essential elements of the crime to be punished.") (alteration, citation, and internal quotation marks omitted)). In considering a motion to dismiss an indictment, the Court may not look beyond "the four corners of the indictment in analyzing whether a cognizable offense has been charged." *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002). An indictment is sufficient to withstand a defendant's motion to dismiss "if it contains the elements of the charged offense in sufficient detail (1) to enable the defendant to prepare his defense; (2) to ensure him that he is being prosecuted on the basis of the facts presented to the grand jury; (3) to enable him to plead double jeopardy; and (4) to inform the court of the alleged facts so that it can determine the sufficiency of the charge." *United States v. Rosi*, 27 F.3d 409, 414 (9th Cir. 1994) (citation omitted).

The Court finds that, although Count One is sufficient, Count Two of the indictment fails to provide "the substantial safeguards to criminal defendants that indictments are designed to guarantee." *United States v. Cecil*, 608 F.2d 1294, 1296 (9th Cir. 1979) (per curiam) (citation and internal quotation marks omitted). Count Two charges Cooper with conspiracy to distribute cocaine base. It alleges that, "[b]eginning on an unknown date but no later than February 4, 2013, and continuing until at least on or about May 29, 2013, in the Northern District of California," Cooper conspired with "other persons known and unknown to the Grand Jury . . . to distribute 28 grams or more of a mixture and substance containing cocaine base . . . ." Indictment at 2. Although Count Two adequately tracks the statutory language, it fails to provide sufficient detail regarding when the alleged conspiracy took place, or any detail at all regarding who the alleged coconspirators were or any facts regarding what they were alleged to have done. *See Cecil*, 608 F.2d at 1297 (reversing district court's denial of motion to dismiss indictment where the time frame was "open-ended in both directions," and the "indictment clearly

United States District Court
For the Northern District of California

6

lacked a statement of the facts and circumstances that would inform the accused of the specific offenses with which they were charged").

The government argues that *Cecil* is no longer good law to the extent that it requires a narcotics conspiracy charge to allege "facts or circumstances pertaining to the conspiracy or any overt acts done in furtherance thereof," 608 F.2d at 1297, because, since *Cecil* was decided in 1979, the Supreme Court has held that conspiracy under 21 U.S.C. § 846 does not require proof of any overt act, *see* Dkt. No. 47 at 3.  The Court agrees that the instant indictment need not include allegations pertaining to any overt acts.  However, the Court finds that *Cecil* is still binding authority to the extent it requires that "an indictment [for violation of 21 U.S.C. § 846 must] contain a few basic factual allegations [to] accord[] defendants adequate notice of the charges against them and assure[] them that their prosecution will proceed on the basis of facts presented to the grand jury."  608 F.2d at 1297.

The Court finds that, while Count One sufficiently charges Cooper with distribution of cocaine base, Count Two – the conspiracy charge – is insufficient.  Accordingly, the Court GRANTS IN PART AND DENIES IN PART defendant's motion to dismiss the indictment.

**3.       Motion for Bill of Particulars and Other Discovery Relief.**

Cooper next moves for a Bill of Particulars and other assorted discovery relief.  Because these issues bear particularly on the conspiracy charge, the Court DENIES the motion at this time, without prejudice to a renewal should the government choose to supercede the indictment.

**4.       Motion to Suppress Evidence Obtained Through Traffic Stop.**

Cooper next moves to suppress the identification made by SFPD officers that Cooper was the individual driving the white Mercedes on February 5, 2013.

The Fourth Amendment permits law enforcement officers to conduct an investigatory stop of a vehicle as long as it is supported by reasonable suspicion – that is, "a particularized and objective basis for suspecting the particular person stopped of criminal activity."  *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000) (citation and internal quotation marks omitted).  "Reasonable suspicion requires 'specific, articulable facts' which, together with 'objective and reasonable' inferences, form

a basis for suspecting that a particular person is engaged in criminal conduct." *Id.* (citation omitted). It is well-settled that law enforcement may stop a vehicle based on a reasonable suspicion that the occupants are involved in an ongoing crime. *See, e.g.*, *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975). However, the Supreme Court has also held that, "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *United States v. Hensley*, 469 U.S. 221, 229 (1985); *see also United States v. Grigg*, 498 F.3d 1070, 1081 (9th Cir. 2007) (holding that the rule in *Hensley* may be extended to *Terry* stops for completed misdemeanors in some circumstances, provided the court considers "the totality of the circumstances, when balancing the privacy interests at stake against the efficacy of a *Terry* stop, along with the possibility that the police may have alternative means to identify the suspect or achieve the investigative purpose of the stop").

An officer who is conducting a stop need not have personal knowledge of the evidence, provided the law enforcement officer on whose directions he relies does have a reasonable suspicion of criminal activity. *Id.* at 231; *United States v. Robinson*, 536 F.2d 1298, 1299-1300 (9th Cir. 1976) ("The fact that an officer does not have to have personal knowledge of the evidence supplying good cause for a stop before he can obey a direction to detain a person or a vehicle does not mean that the Government need not produce evidence at trial showing good cause to legitimate the detention when the legality of the stop is challenged. If the dispatcher himself had had founded suspicion, or if he had relied on information from a reliable informant who supplied him with adequate facts to establish founded suspicion, the dispatcher could properly have delegated the stopping function to Officer Holland.").

The Court finds that the traffic stop of the white Mercedes was a valid investigative stop under *Terry*. On February 5, 2013, FBI agents witnessed a white Mercedes taking part in a controlled buy. Balogh Decl. Ex. B. The FBI proceeded to conduct physical surveillance on the Mercedes, following the vehicle for approximately 30 minutes. *Id.* Ex. F. While that surveillance was still ongoing, the FBI agents asked a marked SFPD vehicle to make a traffic stop of the Mercedes for the purpose of identifying the driver. *Id.* It was vital to the FBI's investigation to learn who was driving the white Mercedes, that is, who had supplied Knight with the drugs he sold to the CHS in the controlled buy.

The agents had already determined that the driver was not Befford; however, they had been unable to determine, even after 30 minutes of physical surveillance, who the driver was. The Court finds that the agents had reasonable suspicion that the driver of the white Mercedes had committed a felony, and that the agents had no alternate means of discovering the driver's true identity. *See Hensley*, 469 U.S. at 229; *Grigg*, 498 F.3d at 1081. Additionally, under these circumstances, it was reasonable for the SFPD officers to rely on the FBI's reasonable suspicion that the driver was committing, or had committed, a felony. *See Hensley*, 469 U.S. at 229; *Robinson*, 536 F.2d at 1299-1300.

Accordingly, the Court concludes that the stop of Cooper's car was a valid investigatory stop, and therefore DENIES defendant's motion to suppress the identification made during that stop.

### 5.    Motion to Suppress the CHS's Identification.

Cooper next moves to exclude evidence of the CHS's out-of-court identification of Cooper as the driver of the white Mercedes.

"Suggestive pretrial identification procedures may be so impermissibly suggestive as to taint subsequent in-court identifications and thereby deny a defendant due process of law." *United States v. Love*, 746 F.2d 477, 478 (9th Cir. 1984). Courts must examine the totality of the circumstances in determining "whether a challenged identification procedure is so impermissibly suggestive as to give rise to a substantial likelihood of mistaken identification . . . ." *United States v. Bagley*, 772 F.2d 482, 492 (9th Cir. 1985). Due process concerns only arise when law enforcement uses identification procedures that are "both suggestive and unnecessary." *Perry v. New Hampshire*, 132 S. Ct. 716, 724 (2012). However, even if a court finds the challenged procedure both suggestive and unnecessary, "suppression of the resulting identification is not the inevitable consequence." *Id.* Instead, courts are directed to determine, "on a case-by-case basis, whether improper police conduct created a 'substantial likelihood of misidentification.'" *Id.* (quoting *Neil v. Biggers*, 409 U.S. 188, 201 (1972)). "'[R]eliability [of the eyewitness identification] is the linchpin' of that evaluation." *Id.* at 724-25 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)).

Thus, courts are tasked with determining whether, under the totality of the circumstances, the witness identification was reliable, even though the identification procedure was suggestive and

**United States District Court**
For the Northern District of California

unnecessary. *Biggers*, 409 U.S. at 199-200. Whether an identification was reliable, or whether it bears a "substantial likelihood of misidentification," requires the examination of several factors: (1) "the opportunity of the witness to view the criminal at the time of the crime," (2) "the witness' degree of attention," (3) "the accuracy of the witness' prior description of the criminal," (4) "the level of certainty demonstrated by the witness at the confrontation," and (5) "the length of time between the crime and the confrontation." *Id.*

The agents first became aware of the white Mercedes during the controlled buy on February 5, 2013. Balogh Decl. Ex. B. At approximately 2:23 p.m., the white Mercedes first entered the parking lot where the CHS was waiting to buy drugs. *Id.* Ex. H ¶ 64. The Mercedes then pulled away, and returned at approximately 2:30 p.m. *Id.* After the controlled buy concluded, an FBI agent contacted the CHS by phone and asked the CHS to view two photos of Johnny Trammell, the man they had identified as the owner of the Mercedes. *Id.* Ex. C. The agent sent the two photos by email, and the CHS responded that Trammell was not the driver of the Mercedes, that the driver was younger and had "close cropped hair." *Id.* The agent then sent the CHS a photo of Tony Befford. *Id.* The CHS responded to the email, saying "Yes that's him." *Id.* The CHS then called the agent back and stated that the CHS believed the individual pictured was the driver of the Mercedes. *Id.*

The agents then undertook physical surveillance of the Mercedes, beginning at approximately 5:15 p.m., and ending at approximately 5:50 p.m., after the SFPD officers stopped the car and confirmed that Cooper was driving the Mercedes. *Id.* Ex. F. The following morning, an FBI agent again called the CHS and asked the CHS to view one additional photo. *Id.* Ex. D. The agent then emailed a photo of Cooper to the CHS. *Id.* The CHS responded that "the individual in the photograph was definitely the driver of the white Mercedes," that "his hair was a bit longer than in the photograph," and that the driver of the Mercedes had been wearing a royal blue hooded sweatshirt. *Id.* The CHS then sent a reply email that stated "100% that's him." *Id.*

The Court agrees with Cooper that the use of single photograph displays for identification was unnecessarily suggestive under the circumstances of this case. Although Cooper was still at large, and one of the FBI's priorities was to identify the driver of that Mercedes, the Court is aware of no reason why the agents could not have provided the CHS with a more standard "six-pack" of photos for

identification purposes.  Indeed, the third individual photo the CHS was shown – the one in which the CHS positively identified Cooper as the driver – was sent the day after the controlled buy, the day after the SFPD officers stopped the Mercedes and identified Cooper as the driver.  The government offers no reasons why the agents, given the lapse of time that occurred here, could not have put together several photos in a single email for the CHS to peruse, a procedure that would have been far less suggestive than the single photo procedure employed here.  Therefore, the Court finds that the single photo procedure, as it was used in this case, was unnecessarily suggestive.

However, this does not conclude the Court's analysis.  The Court must still decide whether the CHS's identification of Cooper was reliable.  The Court finds that, on this record, it has insufficient information on which to base a finding regarding the reliability of the CHS's identification.  At the hearing, the government agreed to attempt to provide Cooper with the actual emails exchanged between the CHS and the agents regarding the photo identifications.  The Court therefore DEFERS RULING on this motion until the record is more fully developed.

**6.      Motion to Suppress Statements and Dismiss Indictment for Sixth Amendment Violation.**

Cooper next argues that all of his post-arrest statements should be suppressed, and the indictment should be dismissed, because law enforcement ignored him when he invoked his right to counsel under the Sixth Amendment.

A defendant's Sixth Amendment right to counsel "is limited by its terms: it does not attach until a prosecution is commenced." *Rothgery v. Gillespie Cnty., Tex.*, 554 U.S. 191, 198 (2008) (citation and internal quotation marks omitted).  A prosecution commences, for Sixth Amendment purposes, at "the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.* (citation omitted).  However, even once the right to counsel has attached, a criminal defendant is not entitled to access to counsel whenever he chooses.  Instead, a defendant's Sixth Amendment rights are only violated if he is denied counsel during "critical stages" of the prosecution.  *See United States v. Ash*, 413 U.S. 300, 321 (1973).

The Court finds that the Cooper's Sixth Amendment rights were not violated here.  On September 26, 2013, a federal agent swore out a criminal complaint against Cooper, but did not arrest

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    him because the government was still hoping Cooper would cooperate.  Millspaugh Decl. ¶ 5.  On

2    October 4, 2013, Cooper met with his probation officer, several officers and agents, and an AUSA to

3    again discuss the possibility of cooperation.  *Id.* ¶ 6.  The AUSA asked Cooper if he wanted to cooperate

4    and Cooper declined.  *Id.*  The meeting lasted approximately five to ten minutes.  *Id.*; Cooper Decl. ¶

5    6  Shortly after 1 p.m., Cooper was arrested pursuant to the criminal complaint.  Millspaugh Decl. ¶ 6.

6         According to Cooper, as soon as he walked into Mr. Magaña's office on October 4, 2013, and

7    saw the people there, he immediately said "I want a lawyer."  Cooper Decl. ¶ 6.  Cooper states that, in

8    response, one of the officers said, "cuff him up."  *Id.*  Cooper claims that the SFPD officers then

9    transported him to an interrogation room at the Hall of Justice, where an officer showed him pictures

10   of "guys from the neighborhood and asked [him] questions about them and activities there [sic] were

11   allegedly involved with."  *Id.*  Cooper states that he told the officer he had nothing to say.  Cooper does

12   not assert that he was ever questioned about the crimes for which he had been arrested, the crimes for

13   which his Sixth Amendment right to counsel had attached.  The government's statements are in accord:

14   no one questioned Cooper about the crimes with which he was charged, either in the federal building,

15   or during processing at the Hall of Justice.  Millspaugh Decl. ¶ 7.  Neither Cooper nor the government

16   alleges that Cooper confessed, or made any statements at all, at any time before he was brought before

17   a magistrate for arraignment on October 7, 2013.

18        Under these circumstances, Cooper's Sixth Amendment rights have not been violated.  The

19   Court assumes that Cooper's Sixth Amendment right to counsel attached, if not with the filing of the

20   criminal complaint on September 26, 2013, then when the officers arrested him pursuant to the

21   complaint on October 4, 2013.  Because Cooper's Sixth Amendment right to counsel attached, he was

22   then entitled to the assistance of counsel at all critical stages of those proceedings.  However, Cooper

23   ignores a critical element in the Sixth Amendment analysis: the Sixth Amendment is offense specific.

24   *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991).  Although the police certainly have an interest in

25   investigating crimes which have already been formally charged, "[t]hey also have an interest in

26   investigating new or additional crimes."  *Maine v. Moulton*, 474 U.S. 159, 179 (1985).  Thus, it does

27   not violate a defendant's Sixth Amendment rights if he is questioned about crimes other than those for

28   which the right to counsel has attached.  *McNeil*, 501 U.S. at 176.

United States District Court
For the Northern District of California

1    Accepting, *arguendo*, Cooper's assertion that an SFPD officer showed him photos and asked him

2    questions about the individuals depicted, this questioning would not have implicated Cooper's Sixth

3    Amendment right to counsel.[1]   Nowhere does Cooper allege that anyone questioned him about the crime

4    for which he was arrested, the crime for which his Sixth Amendment right to counsel had attached.  It

5    would have been entirely permissible, under the Sixth Amendment, for officers to question Cooper

6    about other matters and other crimes.  *See id.*  Thus, the Court finds that Cooper's Sixth Amendment

7    right to counsel was not violated.

8    Cooper's invocation of the *McNabb-Mallory* rule is similarly unavailing.  "[T]he rule known

9    simply as *McNabb-Mallory* 'generally render[s] inadmissible confessions made during periods of

10   detention that violat[e] the prompt presentment requirement of Rule 5(a).'"  *Corley v. United States*, 556

11   U.S. 303, 309 (2009) (quoting *United States v. Alvarez-Sanchez*, 511 U.S. 350, 354 (1994) (alterations

12   in original)).  Simply put, Cooper's argument under *McNabb-Mallory* fails because there is no evidence

13   that Cooper made any statements –let alone a confession – at any time between his arrest on October

14   4, 2013, and his presentment to the magistrate on October 7, 2013.  Thus, there is nothing to suppress

15   and the *McNabb-Mallory* rule is inapplicable to this case.

16   Finally, the Court rejects Cooper's argument that the government engaged in misconduct by

17   causing Cooper to be taken to the Hall of Justice for post-arrest booking, rather than bringing him

18   immediately before the duty magistrate for arraignment.  Cooper contends that the Court should exercise

19   its supervisory powers to dismiss the indictment for the alleged misconduct.

20   The Court finds that the government did not engage in misconduct by transporting Cooper to the

21   Hall of Justice for processing rather than bringing him directly before a magistrate judge.  Cooper was

22   arrested at approximately 1 p.m. on a Friday afternoon.  Millspaugh Decl. ¶ 6.  Following his arrest, two

23

24        [1]Cooper also argues that he was subjected to interrogation without the benefit of counsel at his
     earlier meeting at Mr. Magaña's office, on August 16, 2013.  However, the Court need not decide

25   whether Cooper was, as he argues, "in custody" during that meeting.  Cooper brings this motion under
     the Sixth Amendment, wherein the relevant analysis is whether adversary criminal proceedings have

26   been commenced against Cooper and whether those proceedings have reached a critical stage.  It is
     beyond dispute that, on August 16, 2013, adversary criminal proceedings in this case had not yet been

27   commenced against Cooper.  Therefore, his right to counsel under the Sixth Amendment had not yet
     attached and Cooper was not entitled to counsel.  *Cf. United States v. Hall*, 419 F.3d 980, 985-86 (9th

28   Cir. 2005) (holding, in the Confrontation Clause context, that revocation of parole does not implicate
     a defendant's Sixth Amendment rights because it is not part of a criminal prosecution).

SFPD officers transported Cooper to the Hall of Justice "for post-arrest processing, per usual practice." *Id.* ¶ 7. Because Cooper's arrest took place after the conclusion of the morning magistrate calendar, Cooper was lodged at the San Francisco County Jail over the weekend. *Id.* The Court need not decide whether these policies and decisions resulted in an unnecessary delay in presentment, because the appropriate remedy for a violation of Rule 5's presentment requirement is suppression of evidence obtained during the delay, not dismissal of the indictment. *See Bayless v. United States*, 381 F.2d 67, 70-71 (9th Cir. 1967); *United States v. Savchenko*, 201 F.R.D. 503, 506 (S.D. Cal. 2001) ("The appropriate remedy for a violation of the 'without unnecessary delay' standard of Rule 5 is the suppression of any prejudicial statements provided by the accused during the subject period."); *United States v. Clevenger*, No. 11 cr3518-IEG, 2011 WL 4862413, at *2 (S.D. Cal. Oct.13, 2011) ("The remedy for an unnecessary delay is suppression of statements made by the arrestee . . . . There is no authority for defendant's argument that the Court may dismiss the indictment as a sanction for violation of Rule 5.").

Accordingly, the Court DENIES defendant's motion to suppress statements or dismiss the indictment due to Sixth Amendment violations.

**7.     Motion to Suppress Wiretap Evidence.**

Cooper next moves to suppress evidence gained through two federal wiretaps, covering three target telephone numbers, arguing that: (1) the affidavits in support of the wiretaps failed to establish probable cause; (2) the affidavits contained material misstatements and omissions, justifying a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978); and (3) the government failed to meet the necessity requirement for a wiretap order to issue.

**A.     Background Regarding Wiretap Applications.**

On February 21, 2013, the government sought the first challenged wiretap. The first wiretap sought to intercept communications occurring over a telephone subscribed to, and believed to be used by, Anthony Knight ("TT-1"). Balogh Decl. Ex. H ¶ 10. Cooper was named as one of the target interceptees. *Id.* ¶ 13. The offenses under investigation were: (1) conspiracy to distribute and to possess

United States District Court
For the Northern District of California

1    with intent to distribute controlled substances, in violation of 21 U.S.C. § 846; (2) distribution and

2    possession with intent to distribute of controlled substances, in violation of 21 U.S.C. § 841(a)(1); and

3    (3) the use of a communications facility to facilitate/commit narcotics trafficking, in violation of 21

4    U.S.C. § 843(b).  *Id.* ¶ 11.  On February 21, 2013, Judge Breyer authorized the issuance of the TT-1

5    wiretap.

6             On April 4, 2013, the government sought the second challenged wiretap.  The second wiretap

7    sought to intercept communications occurring over a telephone subscribed to Joe Clark, but believed

8    to be used by Cooper ("TT-2"), and a telephone subscribed to Sip Fadem, with Laurie Collins as the

9    account holder, but believed to be used by Tristan Higgins ("TT-3").  *Id.* Ex. M ¶ 10.  The offenses

10   under investigation included the original three violations, and added two more: (1) maintaining a

11   drug-involved premises, in violation of 21 U.S.C. § 856; and (2) distribution of a controlled substance

12   within 1,000 feet of a school, playground, or public housing, in violation of 21 U.S.C. § 860.  *Id.* ¶ 14.

13   On April 4, 2013, Judge Alsup authorized the issuance of the wiretap for target telephones TT-2 and TT-

14   3.

15

16        **B.       Legal Standard for Wiretaps.**

17             Under the Fourth Amendment, a search warrant may not issue without probable cause.  U.S.

18   Const. amend. IV.  Probable cause exists where the issuing judge can determine that there is a "fair

19   probability" that the evidence sought will be found in the place searched.  *Illinois v. Gates*, 462 U.S.

20   213, 238 (1983) ("The task of the issuing magistrate is simply to make a practical, common-sense

21   decision whether, given all the circumstances set forth in the affidavit before him, including the

22   'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability

23   that contraband or evidence of a crime will be found in a particular place.").  In determining whether

24   a search warrant was based upon probable cause, the district court is "limited to the information and

25   circumstances contained within the four corners of the underlying affidavit."  *United States v. Stanert*,

26   762 F.2d 775, 778 (9th Cir. 1985), *amended on other grounds*, 769 F.2d 1410 (9th Cir. 1985).

27             Review of a determination that a warrant was supported by probable cause is deferential; "the

28   duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . .

United States District Court
For the Northern District of California

conclud[ing]' that probable cause existed." *Gates*, 462 U.S. at 238-39 (alteration in original); *see also United States v. Kelley*, 482 F.3d 1047, 1050 (9th Cir. 2007) ("Normally, we do not 'flyspeck' the affidavit supporting a search warrant through de novo review; rather, the magistrate judge's determination should be paid great deference." (internal quotation marks omitted)).

In the context of wiretaps, a wiretap order should only issue where the government can demonstrate: (1) probable cause that an individual has committed, is committing, or will commit an enumerated offense; (2) probable cause that communications regarding that offense will be intercepted; and (3) that ordinary investigative techniques have been or will be unsuccessful. 18 U.S.C. § 2518(3)(a)-(c). An application for a wiretap must include "a full and complete statement of the facts and circumstances" justifying the need for the wiretap, including the offenses committed, a description of the facilities from which the communications will be intercepted, a description of the types of communications anticipated, and the identities of the individuals who committed the offenses or whose communications are sought, if known to the affiant. *Id.* § 2518(1)(b).

Wiretap evidence procured in violation of Title III may be suppressed. *See United States v. Staffeldt*, 451 F.3d 578, 580 (9th Cir. 2006). Title III enumerates three types of statutory violations that merit suppression: (1) an unlawful interception of communications; (2) an application or wiretap order that is insufficient on its face; and (3) an interception "not made in conformity with the order of authorization or approval." *Id.* (quoting 18 U.S.C. § 2518(10)(a)).

### C.    Standing.

As a preliminary matter, the government argues that Cooper lacks standing to challenge the validity of the wiretap orders. The Court may only exclude evidence on Fourth Amendment grounds if a defendant can demonstrate that his own constitutional rights were violated by an unlawful search or seizure. *Rakas v. Illinois*, 439 U.S. 128, 133-40 (1978). A "defendant's Fourth Amendment rights are violated only when the challenged conduct invaded his legitimate expectation of privacy rather than that of a third party." *United States v. Payner*, 447 U.S. 727 (1980) (citing *Rakas*, 439 U.S. at 143). The wiretap statute confers standing upon "[a]ny aggrieved person." 18 U.S.C. § 2518(10)(a). The statute defines "aggrieved person" as "a person who was a party to any intercepted wire, oral, or

United States District Court
For the Northern District of California

1  electronic communication or a person against whom the interception was directed." *Id.* § 2510(11).

2  Thus, a defendant only has standing to move for suppression when he is a party to an intercepted

3  transmission, or "one against whom the search was directed, as distinguished from one who claims

4  prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at

5  someone else." *Alderman v. United States*, 394 U.S. 165, 173 (1969); *see also United States v. Oliva*,

6  705 F.3d 390, 395 (9th Cir. 2012) (affirming standing even where defendant refused to admit that

7  intercepted conversations included his voice or took place on his premises because he was named in the

8  intercept order and law enforcement believed he was using the target telephones).

9  The government argues that Cooper has failed to establish that he had a reasonable expectation

10  of privacy with respect to any evidence obtained through the wiretaps because he has failed to submit

11  a declaration swearing that his phone conversations were actually intercepted.  The Court disagrees.

12  Cooper has provided the Court with copies of both wiretap applications and affidavits; one names

13  Cooper as a target interceptee, and the other names Cooper as both a target subject and a target

14  interceptee.  Thus, the Court finds that Cooper has amply demonstrated that he is an aggrieved person

15  – that is, that he was a person against whom the search was directed – under the wiretap statute, and

16  therefore has standing to seek suppression of the evidence seized.  *See Oliva*, 705 F.3d at 395.

18  **D.  Probable Cause for the Wiretap Orders.**

19  Cooper argues that the wiretap applications failed to establish probable cause that wiretaps

20  would uncover evidence that Cooper was involved in criminal activity or used TT-2 in furtherance of

21  criminal activity.[2]  The Court disagrees.

22  Probable cause exists if the issuing judge can reasonably conclude, based on the totality of the

23  circumstances, that there is a fair probability that the evidence sought will be found in the place to be

24  searched.  *Gates*, 462 U.S. at 238.  Probable cause does not require direct evidence that the evidence

25  sought will be found in the place searched.  *United States v. Angulo-Lopez*, 791 F.3d 1394, 1399 (9th

27
28  [2]Cooper also argues that he believes the wiretaps may be tainted due to allegedly undisclosed electronic surveillance prior to the wiretaps.  As the Court notes below, the parties have not given the Court sufficient information from which to rule on Cooper's motion regarding pen register and trap and trace evidence.  Therefore, the Court cannot address Cooper's allegation of taint at this time.

Cir. 1986). Instead, the issuing judge "is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense." *Id.*

In the wiretap context, the government is not required to establish probable cause as to each individual the wiretap might intercept. *See United States v. Reed*, 575 F.3d 900, 911 (9th Cir. 2009) (quoting *United States v. Nunez*, 877 F.2d 1470, 1473 n. 1 (10th Cir. 1989) ("[T]he government ha[s] no duty to establish probable cause as to each interceptee. It is sufficient that there was probable cause to tap the phone.") (alterations in original)). Rather, "[a]uthorization for a wiretap is based on probable cause to believe that the telephone is being used to facilitate the commission of a crime . . . ." *Id.*

The Court finds that both wiretap orders were supported by probable cause. The affidavit in support of the TT-1 wiretap set forth the following facts regarding the target phone and its use in the crimes being investigated. On October 16, 2012, the CHS, by direction of law enforcement, called Knight on TT-1 and discussed drug deals and prices. Balogh Decl. Ex. H ¶ 25. On October 17, 2012 the CHS again called Knight on TT-1 and Knight agreed to sell the CHS an ounce and a half of cocaine base. *Id.* ¶ 27. That same day, Knight used TT-1 to send a text to the CHS confirming the drug deal. *Id.* ¶ 29. On October 18, 2012, the CHS spoke to Knight several times on TT-1 about their proposed drug deal. *Id.* ¶¶ 37-42. Knight then met with then CHS and completed the sale. *Id.* On October 27, 2012, the CHS and Knight exchanged several text messages over TT-1 regarding another drug transaction. *Id.* ¶ 43. On January 7, 2013, the CHS and Knight again spoke on TT-1 about another drug deal, with the same price as previous transaction. *Id.* ¶ 45. On January 8, 2013, Knight met with the CHS and completed the sale. *Id.* ¶¶ 48, 54-57. On February 5, 2013, the CHS and Knight spoke again over TT-1 and Knight agreed to sell the CHS more cocaine base. *Id.* ¶ 58. Later that same day, the CHS again called Knight on TT-1 to tell Knight that the CHS was arriving at the agreed upon location. *Id.* ¶ 61. The transaction involving the white Mercedes then took place, as described above.

The affidavit in support of the TT-2 and TT-3 wiretaps set forth the following facts regarding the target phones and their use in the crimes being investigated. On February 5, 2013, one minute after the CHS called Knight regarding the controlled drug buy, Knight used TT-1 to call TT-2. *Id.* Ex. M ¶ 28. That same day, when the CHS called TT-1 to advise Knight that the CHS was arriving at the agreed upon location, TT-1 again called TT-2 within one minute of the conclusion of the call. *Id.* ¶ 34.

1    The affidavit then described the facts surrounding the controlled drug buy and the CHS's and SFPD's

2    identification of Cooper.  *Id.* ¶¶ 37-47.  Following the issuance of the TT-1 wiretap order, law

3    enforcement intercepted many calls related to drug activity between TT-1 and TT-2, the details of which

4    are set forth in the affidavit.  *See id.* ¶¶ 49-69.  The affidavit also detailed evidence obtained through pen

5    registers, pole cameras, and physical surveillance relating to Cooper's use of TT-2 in connection with

6    drug activity.  *Id.* ¶¶ 71-93.  The affidavit is similarly detailed with regard to the use of TT-3 in

7    connection with the crimes under investigation.  *See id.* ¶¶ 95-101.

8         The Court finds that the detailed facts set forth in the affidavits for both wiretaps more than

9    support the issuing judges' findings of probable cause.  Through various investigative methods, law

10   enforcement demonstrated at least a "fair probability" that a wiretap on these phones would intercept

11   evidence of the crimes under investigation.  *See Gates*, 462 U.S. at 238.  The Court concludes that the

12   issuing judges had a more than "substantial basis" for finding probable cause, *id.* at 238-39, and the

13   Court will not disturb that finding here, *see Kelley*, 482 F.3d at 1050 (explaining the "great deference"

14   a reviewing court should pay to the issuing judge's probable cause determination).

15

16        **E.    Material Misstatements and Omissions.**

17        Cooper next argues that the wiretap evidence should be suppressed due to material misstatements

18   or omissions in the supporting affidavits, or, in the alternative, the Court should hold a *Franks* hearing

19   for further investigation into this issue.  Specifically, Cooper contends that the affiants should have

20   provided photos of both Befford and Cooper, because, in his view, Befford and Cooper could not

21   reasonably be mistaken for one another.  Cooper argues that this omission was further compounded by

22   the exclusion of the CHS's explanation that the driver of the Mercedes had longer hair than what

23   Cooper's photo depicted.  Cooper further asserts that the affiants misstated the breadth of surveillance

24   and the efficacy of the pole cameras being utilized in this case.

25        A defendant is entitled to an evidentiary hearing regarding the validity of a search warrant only

26   if he makes a preliminary showing that: (1) the affiant intentionally or recklessly included a false

27   statement in the warrant application; and (2) the false statement was material to the issuing judge's

28   determination of probable cause.  *Franks*, 438 U.S. at 155-56.  Material omissions can likewise form

1  the basis of a *Franks* hearing.  *Stanert*, 762 F.2d at 781.  The defendant bears the burden of proof, and

2  must make a "substantial showing" as to both the required mental state of the affiant, and the materiality

3  of the alleged misstatements or omissions.  *United States v. Chavez-Miranda*, 306 F.3d 973, 979 (9th

4  Cir. 2002).

5        The Court finds that neither suppression nor a *Franks* hearing is warranted in this case.  With

6  respect to Cooper's first argument regarding whether the omission of the photos of Befford and Cooper

7  was material, the Court cannot say that it was completely unreasonable that the CHS initially mistook

8  Befford for Cooper.  Additionally, the warrant affidavit included a description of the CHS's prior

9  statements, including the misidentification of Befford and the later change.  Balogh Decl. Ex. H ¶¶ 71-

10  73.  Thus, the Court finds that the omission of the actual photos was not material to the issuing judges'

11  probable cause finding.

12        With respect to the alleged omission of the CHS's partial explanation behind the CHS's later

13  change of identification from Befford to Cooper – that the driver of the Mercedes had longer hair than

14  that depicted in the photo of Cooper – the Court finds this argument similarly unavailing.  The photo

15  of Befford depicts an African American male with close cropped black hair.  *See id.* Ex. I.  The photo

16  of Cooper depicts an African American male with slightly closer cropped black hair.  *Id.* Ex. J.  Hair

17  grows over time and is sometimes trimmed.  Indeed, at the hearing on this motion Cooper's hair was

18  shorter than it appears in the photo the FBI showed the CHS.  That photo of Cooper was taken at some

19  unknown point in time, prior to being shown to the CHS on February 6, 2013.  On February 5, 2013,

20  when the CHS saw the driver of the Mercedes, Cooper's hair may have been longer than shown in the

21  photo.  The Court finds that the omission of this statement from the warrant affidavit was not material.

22        With respect to Cooper's argument regarding the pole camera surveillance, Cooper appears to

23  argue that the warrant affidavit contained both material misstatements and material omissions.

24  Specifically, he contends that the affidavit for the TT-2 and TT-3 wiretaps referenced eight dates on

25  which the pole cameras conducted surveillance, while discovery produced by the government indicates

26

27

28

that the pole cameras conducted surveillance on eleven other dates prior to the wiretap application.[3]  He further argues that the affidavit offers "the greatly understated description that the pole cameras were able 'to record the publicly viewable activities in the area of West Point Road and Middle Point Road.'" Dkt. No. 37 at 22.  Cooper contends that this description was insufficient because pole cameras have the capacity to zoom in on subjects, and turn left and right.  *See id.*

The Court finds that Cooper has not made a substantial showing that the affidavits' descriptions of the pole camera surveillance contained any misstatements or omissions material to the issuing judges' probable cause findings.  The Court accepts as true, for purposes of this motion, that the government could have included information about additional occasions of pole camera surveillance in its wiretap application.  However, the Court has no way of knowing what the surveillance on those days comprised, or whether its inclusion would even have been relevant to the wiretap application.  If that surveillance depicted additional instances of drug-related conduct, its inclusion would have only strengthened the probable cause finding.  If it did not, then its inclusion would have been irrelevant.  Either way, the Court finds that the inclusion of this information would not have altered the issuing judge's finding of probable cause.

The affidavit detailed the results of the pole camera surveillance on twelve separate occasions prior to seeking this wiretap.  It is clear from the affidavit that the pole cameras were able to record details such as the license plate numbers of cars, and individuals clearly exchanging drugs for money, and that the recordings were clear enough that law enforcement was able to identify the individuals recorded.  *See* Balogh Decl. Ex. M ¶¶ 132-145.  The Court finds that the omission of the mechanical details of how the pole cameras were able to zoom and swivel to accomplish these recordings was not material to the probable cause finding, and the statement that the pole cameras could "record the publicly viewable activities in the area of West Point Road and Middle Point Road" was not a material misstatement.

---

[3]The Court's review of the relevant documents indicates that the affidavit actually referenced twelve separate occasions of pole camera recordings, while defendant's declaration references only nine additional occasions not mentioned in the affidavit.

United States District Court
For the Northern District of California

1    The Court finds that Cooper has failed to make the required "substantial showing" regarding the

2    alleged misstatements or omissions. *See Chavez-Miranda*, 306 F.3d at 979.  Therefore, defendant is not

3    entitled to a *Franks* hearing.

4

5    **F.    Necessity.**

6    Cooper next argues that evidence obtained through the wiretaps should be suppressed because

7    the government failed to establish the requisite necessity for a wiretap order to issue.

8    Before a wiretap order may issue, the government must provide "a full and complete statement

9    as to whether or not other investigative procedures have been tried and failed or why they reasonably

10   appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).  It is then for

11   the issuing judge to decide whether "normal investigative procedures have been tried and have failed

12   or reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Id.* § 2518(3)(c); *see also*

13   *United States v. Spagnuolo*, 549 F.2d 705, 710 (9th Cir. 1977) ("[T]he affidavit must reveal that normal

14   investigative techniques have been employed in a good faith effort to determine the identity of those

15   violating the law and to assemble sufficient evidence to justify their prosecution and that these efforts

16   have failed to achieve their ends.").  "[T]he mere attainment of some degree of success during law

17   enforcement's use of traditional investigative methods does not alone serve to extinguish the need for

18   a wiretap." *United States v. Bennett*, 219 F.3d 1117, 1122 (9th Cir. 2000).  The wiretap statute "does

19   not mandate the indiscriminate pursuit to the bitter end of every non-electronic device . . . to a point

20   where the investigation becomes redundant or impractical or the subjects may be alerted and the entire

21   investigation aborted by unreasonable insistence upon forlorn hope." *United States v. Baker*, 589 F.2d

22   1008, 1013 (9th Cir. 1979).  Courts are to interpret the necessity requirement, instead, "in a practical

23   and commonsense fashion . . . ." *United States v. Bailey*, 607 F.2d 237, 241 (9th Cir. 1979).

24   Cooper makes several arguments in support of his contention that the government failed to

25   establish necessity for the wiretaps: (1) the investigative goals were too broad; (2) the government

26   should have used the CHS to conduct large-scale buys to identify the drug supplier; (3) the government

27   should have used the SFPD to conduct law enforcement stops in conjunction with additional controlled

28   buys; (4) the government should have sought and executed a search warrant at the suspected stash

22

house; and (5) the pole cameras alone would have been sufficient to the government's needs. Cooper also argues that the government's abandonment of the TT-2 wiretap after only two days is evidence that there was no necessity for the wiretaps to issue. The Court shall address each argument in turn.

However, before reaching Cooper's arguments, the Court first notes that both affidavits contained voluminous factual recitations regarding the necessity for a wiretap. The wiretap application for TT-1 discussed extensive physical surveillance; pole camera surveillance; the potential and actual use of undercover agents, confidential sources, and cooperating witnesses; potential cooperation by the target subject and others; pen register, trap and trace, and toll record analysis; trash collection; financial investigation; the potential use of search warrants and grand jury subpoenas; mail covers; and the use of GPS vehicle trackers. *See* Balogh Decl. Ex. H ¶¶ 78-143. The wiretap application for TT-2 and TT-3 contained similar information, updated to contain information obtained through investigation since the TT-1 wiretap was implemented. It omitted information on potential cooperation by the target subjects and others, and added information obtained through the TT-1 wiretap. *See id.* Ex. M ¶¶ 112-184.

Turning to Cooper's first argument, the Court finds that the government's investigative goals were not too broad. The wiretaps sought to establish the manner in which the target telephones were being used to aid the crimes under investigation, the identities of the coconspirators, the network used to acquire and distribute drugs, the structure of the suspected drug-trafficking organization, the means the alleged organization used to launder or dispose of proceeds, the existence and location of records relating to the target offenses, the location of assets related to the target offenses, and the communication facilities used by the target subjects and others, in aid of the target offenses. *Id.* Ex. H ¶ 12; Ex. M ¶15. "The necessity for the wiretap is evaluated in light of the government's need not merely to collect some evidence, but to develop an effective case against those involved in the conspiracy." *United States v. Decoud*, 456 F.3d 996, 1007 (9th Cir. 2006) (citation and internal quotation marks omitted). "An effective case means evidence of guilt beyond a reasonable doubt, not merely evidence sufficient to secure an indictment." *United States v. Garcia-Villalba*, 585 F.3d 1223, 1228 (9th Cir. 2009) (citation and internal quotation marks omitted). With these principles in mind, the Court finds that the government's investigative goals were not too broad, but were instead tailored to provide evidence of guilt beyond a reasonable doubt.

1    Cooper's second argument is also fatally flawed.  Whether the government could have used the

2    CHS to engineer controlled buys for larger amounts of cocaine base, with the ultimate goal of

3    uncovering Knight's source, is entirely speculative.  The necessity requirement "does not mandate the

4    indiscriminate pursuit to the bitter end of every non-electronic device" that might conceivably further

5    the investigation.  *See Baker*, 589 F.2d at 1013.  That the government did not attempt to use the CHS

6    to engineer ever-larger buys in hopes of someday uncovering the source of the drugs does not undermine

7    the necessity for the wiretaps.

8    In his third argument, Cooper claims that the government could have used the SFPD to conduct

9    law enforcement stops in hopes of identifying Knight's supplier.  This argument fails for at least two

10   reasons.  First, repeated investigative stops would likely have alerted the organization to the existence

11   of the government's investigation, thereby undermining its investigative goals.  Second, given Cooper's

12   motion to suppress the identification made through the traffic stop of Cooper, had the government

13   followed this strategy, the Court would instead be presented with a host of motions to suppress any

14   evidence gleaned from those traffic stops.

15   Cooper's fourth argument suffers from a similar defect.  Although the government could have

16   tried to obtain a warrant to search the premises it believed to be the stash house, such an action would

17   have effectively terminated the investigation, rather than furthering the investigative goals.

18   Fifth, Cooper's argument that the pole cameras would have developed sufficient proof to meet

19   the government's investigative goals must fail.  Although pole cameras can supplement physical

20   surveillance, they are limited.  As the affidavits set forth, although they can show behavior consistent

21   with drug trafficking, and they can corroborate witness observations, pole camera recordings alone

22   cannot fully identify customers or suppliers, cannot identify the type of drugs being bought and sold,

23   cannot tell how much money is being paid out, and cannot tell how the proceeds are being laundered

24   or otherwise disposed of.  *See* Balogh Decl. Ex. H ¶ 109; Ex. M. ¶ 146.  The Court finds that the pole

25   cameras, while useful, do not negate necessity for the wiretaps.

26   Finally, the Court rejects Cooper's argument that the government's termination of the TT-2

27   wiretap after only two days of surveillance demonstrates a lack of necessity.  The evidence before the

28   Court demonstrates that the wiretap on TT-2 was terminated after two days because Cooper stopped

United States District Court
For the Northern District of California

1  using the phone.  *Id.* Ex. N ¶ 4.  The fifteen day report indicates that the government did not believe

2  Cooper had abandoned the telephone to evade detection by law enforcement.  That the TT-2 wiretap was

3  relatively unsuccessful does not undermine the necessity for the wiretaps at the time they issued.

4      In sum, the Court finds that the wiretap orders were supported by probable cause, the affidavits

5  did not contain any material misstatements or omissions, and the government sufficiently established

6  necessity for the wiretaps.  Accordingly, defendant's motion to suppress wiretap evidence, or in the

7  alternative, for a *Franks* hearing, is DENIED.

8

9  **8.  Motion to Suppress Evidence Obtained Through Pen Registers and Trap and Trace Devices.**

10      Finally, Cooper moves to suppress information obtained through pen registers and trap and trace

11  devices.  The parties present wildly differing accounts on this issue.  Cooper first asserts that the

12  government produced in discovery two CDs purporting to contain pen register data for phones belonging

13  to Cooper and to Anthony Knight.  Balogh Decl. ¶¶ 15-16.  Cooper states that the materials contain GPS

14  coordinates, whether each call was incoming or outgoing, whether the call was answered, and the length

15  of the call.  *Id.*  The government responded to the instant motion, stating that it received no GPS

16  information from pen registers or trap and trace devices.  Dkt. No. 49.  In reply, Cooper asserts that the

17  two CDs the government purportedly identified as containing pen register data reflect the GPS

18  coordinates for the beginning and end of each call.  Reply Declaration of Ethan A. Balogh ¶ 2.  Given

19  the conflicting information before the Court, and the fact that neither party has provided the Court with

20  the evidence obtained through pen registers and trap and trace devices in this case, the Court cannot rule

21  on this motion at this time.

22      At the hearing it was apparent that there is some confusion regarding what was actually collected

23  through this monitoring process; that is, whether it was GPS information for the target telephones, cell

24  tower data, or something else entirely.  The parties are therefore ORDERED to submit further briefing

25  on this matter, detailing precisely what information was collected and how, and including as exhibits

26  the evidence collected so that the Court may rule appropriately on this matter.

27

28

**CONCLUSION**

For the foregoing reasons and for good cause shown, and on the basis of the record before it, the Court hereby rules as follows:

As to Case No. 3:09-cr-00156:

(1) Defendant's motion to dismiss the Form 12, Docket No. 68, is DENIED;

As to Case No. 3:13-c-693:

(2) Defendant's motion to dismiss the indictment, Docket No. 31, is GRANTED IN PART AND DENIED IN PART;

(3) Defendant's motion for a Bill of Particulars and other discovery relief, Docket No. 32, is DENIED WITHOUT PREJUDICE;

(4) Defendant's motion to suppress the identification made during the SFPD traffic stop, Docket No. 33, is DENIED;

(5) Defendant's motion to suppress the CHS's out-of-court identification, Docket No. 34, is DEFERRED;

(6) Defendant's motion to suppress statements or dismiss the indictment for violation of his Sixth Amendment right to counsel, Docket No. 35, is DENIED;

(7) Defendant's motion to suppress wiretap evidence, or in the alternative, for a *Franks* hearing, Docket No. 37, is DENIED; and

(8) Defendant's motion to suppress evidence gleaned from pen registers and trap and trace devices, Docket No. 38, is DEFERRED PENDING FURTHER SUBMISSIONS.

**IT IS SO ORDERED.**

Dated: July 31, 2014

_____

SUSAN ILLSTON
UNITED STATES DISTRICT JUDGE